**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>YOURWAY TRANSPORT, INC.,<br><br>Defendant. | : | No. 5:26-cv-01329-JFL |

**<u>FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT</u>**

Plaintiff Continental Casualty Company ("Continental"), by and through its undersigned counsel, Kennedys CMK LLP, for its First Amended Complaint for Declaratory Judgment states as follows:

**<u>NATURE OF THE ACTION</u>**

1. This is an action for declaratory judgment pursuant 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, in which the Continental seeks a determination concerning its rights and obligations, if any, to Yourway Transport, Inc. ("Yourway") under insurance policies issued to Yourway by Continental with respect to an underlying lawsuit against Yourway by Vincerx Pharma, Inc. ("Vincerx"), captioned *Vincerx Pharma, Inc. v. Yourway Transport, Inc.*, C.A.No. S23C-09-003 MHC in the Superior Court of the State of Delaware (the "Underlying Action").

2. Continental seeks a declaratory judgment of its rights and obligations with respect to the Underlying Action under two policies: Life Sciences Liability policy number ADT 6080404134 in effect from March 5, 2022 to March 5, 2023 (the "2022-2023 Policy"); and Life

Sciences Liability policy number ADT 6080404134 in effect from March 5, 2023 to March 5, 2024 (the "2023-2024 Policy").[1] A true and correct copy of the 2022-2023 Policy is attached as Exhibit A, and a true and correct copy of the 2023-2024 Policy is attached as Exhibit B.

3. Continental seeks a declaration that it has no further obligation to defend Yourway and no obligation to indemnify Yourway under the Continental Policies in connection with the Underlying Action.

**THE PARTIES**

4. Plaintiff Continental is an insurance company organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

5. Defendant Yourway Transport, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Allentown, Pennsylvania.

6. Yourway is an integrated biopharmaceutical supply chain solutions provider offering a full range of primary and secondary clinical packaging, temperature-controlled logistics, storage and distribution services for the global pharmaceutical and biotech industries.

**JURISDICTION AND VENUE**

7. This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), because this action is between citizens of different states and the amount in controversy exceeds $75,000.

[1] The 2022-2023 Policy and the 2023-2024 Policy will be referred to collectively as the "Continental Policies."

9. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1) because Yourway is a citizen of Pennsylvania with its principal location in the Eastern District of Pennsylvania.

## FACTUAL BACKGROUND

### A. The Underlying Action[2]

10. The Underlying Action arises from a dispute between Yourway and its customer, Vincerx, and Vincerx's claim that Yourway breached its contract with Vincerx and was negligent in failing to properly handle cargo referred to as "research, master, and working cell banks (the "Cell Banks").

11. A "research cell bank" is a way to grow and store cells that have certain genetic characteristics for harvesting cells for future use in making drug products. (Ex. C, First Amended Complaint, ¶ 23)

12. A "master cell bank" is a small sample of cells having a narrowly defined subset of genetic characteristics of the research cell bank. Using standardized laboratory procedures under defined conditions, master cells are dispensed into multiple containers shown to be free from accidental contamination and stored under special conditions. (Id., at ¶ 24)

13. Master cell banks are used to create "working cell banks." Working cell banks are used in production to create quantities of a desired antibody for use in making a final drug product. (Id., at ¶ 25)

14. Vincerx alleges that Yourway marketed itself as a company specializing in the transportation and handling of temperature-sensitive materials such as the Cell Banks. (Id., at ¶ 2)

---

[2] The allegations in this section are based on the allegations of the First Amended Complaint in the Underlying Action. A copy of the First Amended Complaint in the Underlying Action is attached as Exhibit C.

15. The Underlying Action involves transporting a shipment of Cell Banks by Yourway that took place in late 2021.

16. In 2021, Vincerx and Yourway entered into a Master Services Agreement to govern services provided by Yourway in shipping Vincerx's pharmaceutical-related materials, including the Cell Banks. (Id., at ¶ 32)

17. The Cell Banks needed to remain at a temperature of -196 °C (-320 °F) during the period in which Yourway was responsible for them. If the temperature were to climb above this requirement, the Cell Banks would be destroyed, making them useless for the manufacture of Vincerx's drug product. (Id., at ¶ 2)

18. Vincerx alleges that Yourway knew and understood that the best method for preserving the Cell Banks was to use Cryoport High Volume Dry Shippers (the "Cryoport Shippers"). Cryoport Shippers are designed with insulating space around the sample chamber. That space is referred to as the "Dewar." Yourway was to fill the Dewar surrounding the sample chamber using a dry vapor liquid nitrogen method to keep its internal temperatures at -196 °C (-320 °F) in accordance with the Cryoport Shippers manufacturer's procedures (the "Method"). The Cryoport Shippers were validated by the manufacturer to maintain temperatures of -150 °C or colder for ten days using the Method. (Id., at ¶ 2)

19. Vincerx alleges that because of the high value and temperature-sensitivity of the Cell Banks, Vincerx required Yourway to agree to several important contractual obligations, including that Yourway would abide by the "highest prevailing industry standards and practices" and only employ people that had the "proper skill, training, availability and experience." (Id., at ¶ 4.)

20. On or about November 30, 2021, Yourway picked up the Cell Banks, which were stored in three Cryoport Shippers. (Id., at ¶ 5)

21. Due to the criticality of the temperature of the Cell Banks, each of the Cryoport Shippers possessed an internal temperature tracker that provided Yourway with frequent updates. (Id., at ¶ 6)

22. The Cryoport Shippers containing the Cell Banks arrived in Philadelphia, Pennsylvania on or about December 4, 2021 and were transported to Yourway's facility in Allentown, Pennsylvania while awaiting clearance from customs. (Id., at ¶¶ 7, 50)

23. On December 7, 2021, Yourway reported to Vincerx, "[the] shipment is currently in our US facility and being kept in correct temperature." (Id., at ¶ 50)

24. From December 4, 2021 to December 14, 2021, shipment of the Cryoport Shippers containing the Cell Banks was delayed for customs clearance. The three Cryoport Shippers were held in storage at Yourway's Allentown, Pennsylvania facility for the duration of the December 4, 2021 to December 14, 2021 delay for customs clearance.

25. Vincerx alleges that notwithstanding that the Cryoport Shippers were validated to maintain temperature for only ten days from the date that they were packaged, Yourway did not monitor temperatures of the Cryoport Shippers to maintain the required temperature for the Cell Banks, and did not attempt to refill the Cryoport Shippers with liquid nitrogen until on or after December 16, 2021 (*i.e.*, sixteen or more days from the date that the Cryoport Shippers had been packed). Vincerx alleges that Yourway made critical mistakes and used an improper method to refill the Cryoport Shippers with liquid nitrogen. (Id., at ¶¶ 8, 51, 52, 53)

26. Vincerx alleges that given the critical importance of the temperature control of the Cell Banks, Yourway was required to refill the Cryoport Shippers in accordance with the Method

no later than December 10, 2021, and should have immediately replaced any malfunctioning temperature trackers. (Id. at ¶ 55)

27. Vincerx alleges that rather than refilling the Dewar using the Method, Yourway added liquid nitrogen directly to the sample chamber holding the Cell Banks. Vincerx alleges that this alone could have destroyed the Cell Banks. Vincerx further alleges that within hours of the failed refill, the internal temperatures of the Cryoport Shippers spiked up to ambient temperature further ensuring the Cell Banks' destruction. (Id., at ¶ 9)

28. Vincerx further alleges that two of the Cryoport Shippers' internal temperature tracking systems failed while they were in Yourway's possession, custody and control. It is alleged that the failure of the temperature tracking system required Yourway's immediate attention, but Yourway failed to monitor these Cryoport Shippers, never addressed the problem, and failed to inform Vincerx of it. (Id., at ¶¶ 10, 54)

29. Vincerx alleges that by the time the Cell Banks arrived at their destination in San Diego, California, from Yourway's facility in Allentown, Pennsylvania, all three Cryoport Shippers, and their contents, had risen to ambient temperature, which rendered the Cell Banks useless for their intended purpose. (Id., at ¶¶ 11, 58)

30. Vincerx alleges that Yourway acknowledged that the Cryoport Shippers were designed to maintain the required temperature for about ten days and that thus, when the Cryoport Shippers were in Yourway's control, Yourway was required to refill each of the Cryoport Shippers using the Method to maintain the proper temperature. (Id., at ¶ 64.)

31. Vincerx alleges that Yourway's quality assurance personnel acknowledged that the internal temperature of the Cryoport Shippers rose to ambient temperature during Yourway's possession, custody, and control at Yourway's facility in Allentown, Pennsylvania. (Id., at ¶ 65.)

32. Temperature data readings for the Cryoport Shippers show that the internal temperature of the Cryoport Shippers rose from -196 °C to 20°C between December 11, 2021 and December 16, 2021. After December 15, 2021, the internal temperature of the Cryoport Shippers stayed between -20 °C and 20 °C. A copy of the temperature data readings is attached as Exhibit D.

33. Vincerx alleges that the destruction of the Cell Banks by Yourway caused significant damage to Vincerx in excess of $1,000,000, which Vincerx seeks to recover from Yourway in the Underlying Action. (Ex. C, at ¶¶ 13, 82, 90, 98.)

**B. <u>Vincerx's Claim for Damage to the Cell Banks</u>**

34. On January 7, 2022, Vincerx notified Yourway that when the Cryoport Shippers were received in San Diego the coolant in all three Cryoport Shippers had dissipated and the temperature inside all three Cryoport Shippers was ambient. Vincerx requested that Yourway discuss the issue with Vincerx because the Cell Banks were "of high value and priority."

35. On January 31, 2022, Malcolm McKay of Vincerx sent an email to Yourway's Vice President of Global Quality, Carl Budson, stating:

> Vincerx wishes to file a complaint concerning Yourway shipment 249174 (Proforma Invoice attached for reference).
>
> The shipment from Bayer (Wuppertal, Germany) to PCI (San Diego, CA) contained our Anti-IL3RA Research, Master and Working Cell banks. We are notified by PCI that when the 3 Cryoport shippers arrived in San Diego there were all reading ambient temperature (temperature charts attached). It also appears that the temperature monitor in the second shipper malfunctioned since the report terminates on 02DEC2021.
>
> Whereas, the shippers were designated for vapor phase liquid nitrogen, we believe they were replenished with liquid (as opposed to vapor phase) nitrogen while being held for US Customs and FDA clearance at your Allentown facility.
>
> Thank you for your attention to this matter. We will send our availability for a meeting in a separate email.

36. Beginning on February 3, 2022, Yourway undertook an investigation of the temperature excursion incident. Yourway's investigation report dated February 10, 2022, identified the cause of the temperature excursion was, "the Liquid Nitrogen (LN2) containers where not adequately refilled during the replenishment on the 16th December, 2021."

37. On January 4, 2023, Vincerx's Vice President of IP and Legal Operations, John FitzPatrick, sent a letter to the attention of Yourway's President, Gulamali Jaffer (the "Material Breach Notice"). The Material Breach Notice notified Yourway that Vincerx claimed that Yourway had materially breached its obligations under the Master Services Agreement between Vincerx and Yourway with respect to the transport, storage, and handling of the Cell Banks. A copy of the Material Breach Notice is attached as Exhibit E.

38. The Material Breach Notice stated:

> Because of Yourway's negligence and material breach of the Agreement, Vincerx has suffered significant damages and hereby demands compensation from Yourway for those losses.

(Ex. E)

39. The Material Breach Notice further stated:

> Unless a resolution can be worked out that appropriately compensates Vincerx for its losses, Vincerx intends to pursue a claim for all damages and costs, which as of the date of this letter total in excess of $1.8 million. . . . [I]f we have not received a prompt and acceptable response from YourWay, we will move forward with our damages claim.

(Ex. E)

40. The Material Breach Notice also notified Yourway that Yourway had an obligation to preserve and maintain all information, materials and documents that may be "remotely relevant" to the material breach, or discoverable in any action that may arise. Furthermore, the Material Breach Notice requested that Yourway send to Vincerx copies of Yourway's insurance policies. (Ex. E)

41. On January 16, 2023, Yourway's President, Mr. Jaffer, responded to the Material Breach Notice by sending a letter to Mr. FitzPatrick of Vincerx. Mr. Jaffer's letter referred to wording in the Bill of Lading ("BOL") for the shipment and stated, "[b]ased on the above exclusion provided on the BOL, Yourway is not responsible for any loss sustained to your product and seeks immediate release from any and all damages." A copy of the January 16, 2023 letter is attached as Exhibit F.

42. On September 6, 2023, Vincerx filed its Complaint in the Underlying Action and served the Summons and Complaint upon Yourway on the same day.

**C. <u>Yourway's Late Disclosure and Reporting of the Claim to Continental</u>**

43. In February 2023, Yourway submitted a Renewal Application to Continental in order to renew the 2022-2023 Policy for a policy period beginning on March 5, 2023. A copy of the Renewal Application is attached as Exhibit G.

44. The Renewal Application was signed by Yourway's Cathy Baker on February 2, 2023. (Ex. G)

45. The Renewal Application included a question asking Yourway to identify "any known claims or occurrence(s) not yet reported." Yourway responded "no," and did not disclose the Notice of Material Breach it had received in January 2023. (Ex. G)

46. In text above the signature of Cathy Baker, the Renewal Application states:

> The undersigned **authorized officer of the applicant** knows of no other relevant facts which might affect the Company's[3] judgment when considering this renewal application and warrants that the statements herein are true, and it is agreed that this renewal application shall be the basis of the renewal contract and shall be deemed incorporated therein should the Company evidence its acceptance of this renewal application by issuance of a renewal policy. It is agreed that this renewal application shall be on file with the Company and that it shall be deemed to be

[3] The "Company" refers to Continental.

> attached to and made part of the renewal policy, if issued, as if physically attached to the renewal policy.

(Ex. G)

47. On October 3, 2023, Yourway notified Continental of the Complaint in the Underlying Action.

48. On November 16, 2023, Continental responded to Yourway's notice of the Underlying Action and agreed to provide a defense to Yourway in the Underlying Action under the 2023-2024 Policy subject to a reservation of rights.

49. Since November 2023, Continental has been defending Yourway in the Underlying Action and has paid defense costs for the defense of Yourway in the Underlying Action.

50. The Underlying Action proceeded to trial on March 2, 2026.

51. On March 5, 2026, the jury in the Underlying Action rendered a verdict in favor of Vincerx and against Yourway, in the amount of $7,650,000.

52. On March 19, 2026, Yourway filed a post-trial motion seeking a new trial on damages or, in the alternative, a remitter of the jury's damages award.

53. Continental continues to provide Yourway with a defense in Underlying Action throughout Yourway's pursuit of post-trial motions and of any potential appeal of the jury verdict.

54. Continental has not withdrawn its defense of Yourway in the Underlying Action.

**D. <u>The Continental Policies</u>**

55. The Continental Policies provides "Products-Work Hazard Coverage" and "Professional Services Coverage."[4]

---

[4] The terms, conditions and exclusions and other policy wording of the 2022-2023 Policy and the 2023-2024 Policy that are relevant here are identical.

56. The 2022-2023 Policy was in effect for a policy period of March 5, 2022 to March 5, 2023.

57. The 2023-2024 Policy was in effect for a policy period of March 5, 2023 to March 5, 2024.

58. The policy limits of each of the Continental Policies are $5,000,000 for each claim and $5,000,000 in the aggregate.

59. The Products-Work Hazard Coverage liability coverage part provides:[5]

> **COVERAGE – Products-Work Hazard Coverage**
>
> The insurer will pay all amounts in excess of the deductible up to the limit of liability that the **Insured** becomes legally liable to pay as **damages** as a result of:
>
> **A.** **bodily injury** or **property damage** caused by an **occurrence** and arising out of a covered **products-work hazard claim**;
>
> * * *
>
> provided that coverage applies to **claims** only if:
>
> 1. such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer in accordance with the **COMMON CONDITIONS**, the section entitled **DUTIES IF THERE IS A CLAIM**;
>
> 2. prior to the effective date of the **coverage relationship**, no **executive officer** knew or had a basis to believe:
>
>    a. that any **bodily injury** or **property damage** had occurred. If any **executive officer** knew, prior to the **coverage relationship** that any **bodily injury** or **property damage** had occurred, then any continuation, change or resumption of such **bodily injury** or **property damage** during or after the **coverage relationship** will be deemed to have been known prior to the **coverage relationship**;
>
> * * *
>
> An **executive officer** will be deemed to know:

[5] Terms in the policy that appear in bold type are defined terms.

a. that such **bodily injury** or **property damage** occurred, at the earliest time when such **executive officer**:

i. reports the **bodily injury** or **property damage** to the insurer or any other insurer;
ii. receives a **claim** arising out of the **bodily injury** or **property damage**; or
iii. becomes aware by any other means that the **bodily injury** or **property damage** has occurred or has begun to occur;

(Ex. A)

60. The Products-Work Hazard Coverage is subject to the following exclusions:

**EXCLUSIONS**

This **coverage part** does not apply to any **claim** against any **Insured**:

* * *

**14. Property Damage to Property the Insured Entity Owns or in its Care, Custody or Control**

Based on or arising out of any actual or alleged **property damage** to:

* * *

**d.** personal property in the care, custody or control of any **Insured.**

**15. Property Damage to Insured Products**

based on or arising out of any actual or alleged **property damage** to **insured products** arising out of such products or any part of such products.

(Ex. A)

61. The Professional Services Coverage Part provides:

The Insurer will pay all amounts in excess of the deductible up to the limit of liability that the **Insured** becomes legally liable to pay as damages as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured** or by someone for whom the **Insured** is liable, provided that coverage applies to **claims** only if:

A. such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer in accordance with the **COMMON CONDITIONS**, the section entitled **DUTIES IF THERE IS A CLAIM**;

B. prior to the effective date of the **coverage relationship**, no **executive officer** knew or had a basis to believe that any **wrongful act** might reasonably be expected to be the basis of any such **claim**;

C. prior to the effective date of this policy:

1. no **Insured** gave notice to a prior insurer of any **potential claim** or **related claim**; and

2. neither an **Insured** nor the Insurer made a written declaration of a **related claim**; and

D. such **wrongful act** first occurred on or after the retroactive date, if any, specified in the Declarations.

(Ex. A)

62. The following definitions apply to terms used in the Continental Policies.

63. "Application" is defined as:

**Application** means all signed applications for this policy and for any policy in an uninterrupted series of policies issued by the Insurer or any affiliate of the Insurer of which this policy is a renewal or replacement. **Application** includes any materials submitted or required to be submitted therewith. An "affiliate of the Insurer" means an insurer controlling, controlled by or under common control with the Insurer.

(Ex. A)

64. "Claim" is defined as:

**Claim** means:

A. a demand for money or services; or

B. a civil proceeding or an arbitration proceeding or any appeal therefrom,

against the **Insured** and alleging an incident. A **claim** does not include a **circumstance**.

(Ex. A)

65. “Circumstance” is defined as, “an **incident** reported during the **policy period** from which an **executive officer** reasonably expects that a claim could be made.” (Ex. A)

66. “Clinical trial” is defined as, “an organized study, test or written protocol that uses human subjects to establish the effectiveness, bioequivalence or safety of **insured products**.” (Ex. A)

67. “Coverage relationship” is defined as follows:

> **Coverage relationship** means that period of time beginning on the effective date and time of the first policy issued by the Insurer to the **First Named Insured** of which this policy is a renewal in a consecutive series of renewals and the cancellation or nonrenewal of the last such consecutive renewal policy issued by the Insurer to the **First Named Insured**, where there has been no gap in coverage.

(Ex. A)

68. “Executive officer” is defined as follows:

> **Executive officer** means a person holding any of the officer positions created by the **Insured Entity’s** charter, constitution, by-laws or any other similar governing document and its in-house general counsel, corporate risk manager and any **employee** who is responsible for its insurance or claim reporting.

(Ex. A)

69. “Insured product” is defined as follows:[6]

| **SCHEDULE** | |
|---|---|
| **Brand or Trade Name** | **Chemical Name** |
| Brand Name Inapplicable | Chemical Name Inapplicable |
| Re-packaging, re-labing (bulk or otherwise), and distribution of pharmaceutical products to be used in clinical trials. | NA |

> It is understood and agreed that the definition of **insured product** set forth in the **GLOSSARY OF DEFINED TERMS** is deleted in its entirety and replaced with the following:

[6] The definition of “Insured product” is found in Endorsement 1 of the Policy.

**Insured product** means:

A. The goods or products shown in the **SCHEDULE** above; and

B. containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products

**Insured product** includes:

1. warranties or representations made at any time with respect to the fitness, quality, durability, performance, use, handling, operation or safety of **insured product;** and

2. the providing of or failure to provide warnings or instructions.

(Ex. A)

70. "Insured Work" is defined as follows:

**Insured work** means:

A. work performed by the **Insured Entity** or on its behalf solely in connection with **insured product** or solely in connection with its **clinical trials**, including, but not limited to testing, review, installation, maintenance, or repair of insured product or in connection with its **clinical trials**; and

B. materials, parts or equipment furnished in connection with such work, **operations or services**.

**Insured work** includes:

1. warranties or representations made at any time with respect to the fitness, quality, durability, performance, use, handling, operation, safety or maintenance of **Insured work**; and

2. the providing of or failure to provide warnings or instructions.

(Ex. A)

71. "Policy period" is defined as "the period of time shown in the Declarations of this policy or as amended by endorsement or cancellation. (Ex. A)

72. "Products-Work Hazard" is defined as:

A. **bodily injury** or **property damage** arising out of **insured product** or **insured work**; or

B. **personal and advertising injury** but solely to the extent such **personal and advertising injury** arises out of the **Insured Entity's clinical trials**.

However, **product-work hazard** does not include **bodily injury** or **property damage** arising out of:

1. the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle created by the **loading or unloading** of it; or

2. the existence of tools, uninstalled equipment, or abandoned or unused materials.

(Ex. A)

73. "Products-Work Hazard Claim" is defined as "a **claim** alleging a **products-work hazard**." (Ex. A)

74. "Professional liability claim" is defined as "a claim alleging a **wrongful act** in the rendering of, or the failure to render, **professional services** but solely to the extent such **claim** alleges injury other than **bodily injury**, **property damage** or **personal and advertising injury**. (Ex. A)

75. "Professional services" is defined as follows:

**Professional services** mean those services performed by the **Insured Entity**, or by any other **Insured** on its behalf, for a fee or other remuneration, provided such services are specified in a written contract or agreement for the performance of **professional services** between the **Insured Entity** and its client, which contract was entered into prior to the date of the **wrongful act** giving rise to the **claim** and after the **retroactive date**. **Professional services** also include:

A. services incidental to those services specified in such written contract or agreement which incidental services must be done to fulfill the contract and are agreed to by the **Insured Entity** orally or in writing after the execution of the written contract or agreement and prior to the date of the **wrongful act** giving rise to the **claim**; and

B. **clinical trial consultant services**.

However, **professional services** do not include **medical services**.

(Ex. A)

76. “Property Damage” is defined as follows:

**Property damage** means:

A. physical injury to tangible property, including the loss of use thereof. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

B. loss of use of tangible property that has not been physically injured or destroyed. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

(Ex. A)

77. “Wrongful act” is defined as “any actual or alleged negligent act, error or omission in the rendering of **professional services** by any **Insured** on the **Insured Entity’s** behalf.” (Ex. A)

78. The Common Policy Condition section of the Policies sets forth conditions on coverage provided under the Continental Policy.

79. The Common Policy Conditions provide as follows:

**NOTICE: THIS IS A CLAIMS MADE POLICY. THE COVERAGE AFFORDED BY THIS POLICY IS LIMITED TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY IN ACCORDANCE WITH THE COMMON CONDITIONS, THE SECTION ENTITLED DUTIES IF THERE IS A CLAIM.**

* * *

In consideration of the payment of the premium, and in reliance upon the statements in the **application**, it is agreed as follows:

(Ex. A)

80. The ENTIRE CONTRACT section of the Conditions states:

By acceptance of this policy the **Insured Entity** agrees that:

A. all of the information and statements provided to the Insurer by the **Insured Entity** are true, accurate and complete and shall be deemed to constitute material representations made by all of the **Insureds**;

B. this policy is issued in reliance upon the **Insured Entity's** representations;

C. this policy, endorsements thereto, together with the completed and signed **application** (which is deemed to be incorporated herein) embody all of the agreements existing between the **Insureds** and the Insurer and shall constitute the entire contract between the **Insureds** and the Insurer; and

D. the willful or intentional misrepresentation of any material matter by the **Insured Entity** or its agent will render this policy null and void and relieve the Insurer from all liability herein.

(Ex. A)

81. The "Insured Entity" is Yourway Transport, Inc.

82. The DUTIES IF THERE IS A CLAIM section of the Conditions states:

It is a condition precedent to coverage that the **Insured**:

A. notify the Insurer as soon as reasonably possible of any **claim**. Such must be in writing and be sent to the attention of CNA Healthcare Claims at the e-mail address or phone number set forth in the Policy Declarations. Such notice must be given to the Insurer as soon as reasonably possible but in no event later than ninety days (90) after termination or expiration of the **coverage relationship**, or during the **extended reporting period**, if applicable;

B. specify the names and addresses of the persons making a **claim** against the Insured and provide the Insurer with information on the time, place and nature of the **claim**;

C. promptly forward to the Insurer all documents that the **Insured** receives in connection with the **claim**;

(Ex. A)

83. The WHEN A CLAIM IS DEEMED MADE section of the Conditions states:

Except as set forth in the section entitled **DUTIES AND RIGHTS IN THE EVENT OF A CIRCUMSTANCE OR A POTENTIAL CLASS 1 PRODUCT RECALL claim** is deemed made on the earliest of the following:

A. in the case of a demand, on the earlier of an **executive officer's** or Insurer's receipt of such demand; or

B. in the case of a civil proceeding in a court of law or equity, or arbitration, on the date of service upon or other receipt by the **Insured Entity** of a complaint against the **Insured Entity** in such proceeding or arbitration.

(Ex. A)

84. Continental asserts the following claims for Declaratory Judgment, each in the alternative.

**COUNT I – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under Professional Services Coverage**
**(No Professional Liability Claim)**

85. Continental repeats and realleges the allegations set forth in paragraphs 1 through 79 as if fully set forth herein.

86. Vincerx's claim against Yourway in the Underlying Action seeks to recover damages caused by the destruction of the Cell Banks.

87. The destruction of the Cell Banks constitutes "property damage" as that term is defined in the Continental Policies.

88. The Professional Services Coverage of the Continental Policies provides coverage, according to the policy terms, for "**damages** as a result of a covered **professional liability claim**."

89. A "professional liability claim" is defined in the Continental Policies as a "claim alleging a **wrongful act** in the rendering of, or failure to render, **professional services** but solely to the extent such **claim** alleges injury other than **bodily injury**, **property damage** or **personal and advertising injury**."

90. The only injury alleged in the Underlying Action is "property damage."

91. The March 5, 2026, jury verdict of $7,650,000 in the Underlying Action is compensation for damages for injury in the form of "property damage."

92. Therefore, the claim against Yourway in the Underlying Action does not fall within the coverage provided by the Professional Services Coverage of the Continental Policies.

93. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action or any subsequent appeals of the verdict in the Underlying Action.

94. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**COUNT II – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under Products-Work Hazard Coverage**
**(No Claim Alleging a Products-Work Hazard)**

95. Continental repeats and realleges the allegations set forth in paragraphs 1 through 88 as if fully set forth herein.

96. The Products-Work Hazard Coverage of the Continental Policies provides coverage, according to its terms, for "**damages** as a result of . . . **bodily injury** or **property damage** caused by an **occurrence** and arising out of a covered **products-work hazard claim**."

97. "Products-work hazard claim" is defined in the Continental Policies as "a **claim** alleging a **products-work hazard**."

98. The definition of "products-work hazard" in the Continental Policies states, "**products-work hazard** does not include . . . **property damage** arising out of: 1. The transportation of property, unless the . . . **property damage** arises out of a condition in or on a vehicle created by the **loading or unloading** of it; or 2. The existence of tools, uninstalled equipment, or abandoned or unused materials."

99. Vincerx's claim against Yourway in the Underlying Action solely involves alleged property damage that arose out of the transportation of the Cell Banks.

100. The alleged damage to the Cell Banks did not arise out of a condition in or on a vehicle created by the loading or unloading of the vehicle.

101. The alleged damage to the Cell Banks did not arise out of the existence of tools, uninstalled equipment, or abandoned or unused materials.

102. The March 5, 2026, jury verdict of $7,650,000 in the Underlying Action is compensation for damages for "property damage" that arose out of the transportation of the Cell Banks, did not arise out of a condition in or on a vehicle created by the loading or unloading of the vehicle, and did not arise out of the existence of tools, uninstalled equipment, or abandoned or unused materials.

103. Therefore, the claim against Yourway in the Underlying Action does not fall within the coverage provided by the Products-Work Hazard Coverage of the Continental Policies.

104. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action or any subsequent appeals of the verdict in the Underlying Action.

105. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**COUNT III – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under Products-Work Hazard Coverage**
**(No Claim Alleging a Products-Work Hazard)**

106. Continental repeats and realleges the allegations set forth in paragraphs 1 through 98 as if fully set forth herein.

107. The Products-Work Hazard Coverage of the Continental Policies provides coverage, according to its terms, for "**damages** as a result of . . . **bodily injury** or **property damage** caused by an **occurrence** and arising out of a covered **products-work hazard claim**."

108. "Products-work hazard claim" is defined in the Continental Policies as "a **claim** alleging a **products-work hazard**."

109. The definition of "Products-work hazard" in the Continental Policies states, "**products-work hazard** means: A. **bodily injury** or **property damage** arising out of **insured product** or **insured work**."

110. "Insured product" is defined in the Continental Policies as "Re-packaging, re-labing [sic] (bulk or otherwise), and distribution of pharmaceutical products to be used in clinical trials."

111. "Insured work" is defined in the Continental Policies as "work performed by the **Insured Entity** or on its behalf solely in connection with **insured product** or solely in connection with its **clinical trials**, including, but not limited to testing, review, installation, maintenance, or repair of insured product or in connection with its **clinical trials**."

112. The Underlying Action does not involve an "insured product" or "insured work" because there is no allegation that the Cell Banks were to be used in clinical trials.

113. The March 5, 2026, jury verdict of $7,650,000 in the Underlying Action is not compensation for damages for injury arising out of an "insured product" or "insured work."

114. Therefore, the claim against Yourway in the Underlying Action does not fall within the coverage provided by the Products-Work Hazard Coverage of the Continental Policies.

115. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action or any subsequent appeals of the verdict in the Underlying Action.

116. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**COUNT IV – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under Products-Work Hazard Coverage**
**(Exclusions)**

117. Continental repeats and realleges the allegations set forth in paragraphs 1 through 108 as if fully set forth herein.

118. The Products-Work Hazard Coverage of the Continental Policies is subject to the following exclusions.

119. Exclusion 14 for "Property Damage to Property the Insured Entity Owns or in its Care, Custody or Control" states that the Products-Work Hazard Coverage does not apply to any claim "based on or arising out of any actual or alleged **property damage** to: . . . personal property in the care, custody or control of any **Insured**."

120. Exclusion 15 for "Property Damage to Insured Products" states that the Products-Work Hazard Coverage does not apply to any claim "based on or arising out of any actual or alleged **property damage** to **insured products** arising out of such products or any part of such products."

121. Without admitting that the Underlying Action is otherwise covered by the Products-Work Hazard Coverage, Exclusion 14 would apply to preclude coverage under the Products-Work Hazard Coverage because alleged property damage to the Cell Banks occurred while the Cell Banks were in the care, custody and control of Yourway.

122. Without admitting that the Underlying Action is otherwise covered by the Products-Work Hazard Coverage or that the Cell Banks are an "insured product," as that term is defined in the Continental Policies, Exclusion 15 would apply to preclude coverage under the Products-Work Hazard Coverage because if the Cell Banks are considered an "insured product," the property damage alleged in the Underlying Action is property damage to an "insured product."

123. Therefore, the claim against Yourway in the Underlying Action does not fall within the coverage provided by the Products-Work Hazard Coverage of the Continental Policies.

124. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action or any subsequent appeals of the verdict in the Underlying Action.

125. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**COUNT V – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under the 2023-2024 Policy**
**(No Claim Made During the Policy Period)**

126. Continental repeats and realleges the allegations set forth in paragraphs 1 through 117 as if fully set forth herein.

127. The Professional Services Coverage and the Products-Work Hazard Coverage of the Continental Policies applies to "**claims** only if: 1. Such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer in accordance with the **COMMON CONDITIONS**, the section entitled **DUTIES IF THERE IS A CLAIM**."

128. The Material Breach Notice is a "claim" as that term is defined in the Continental Policies and is the "claim" that is at issue in the Underlying Action.

129. The "claim" made in the Material Breach Notice is deemed to have been first made against Yourway upon receipt of the Material Breach Notice by Yourway's President Mr. Jaffer, which occurred between January 4, 2023 and January 16, 2023.

130. The policy period of the 2023-2024 Policy began on March 5, 2023.

131. The "claim" made against Yourway at issue in the Underlying Action was not first made against Yourway during the policy period of the 2023-2024 Policy.

132. Therefore, the claim against Yourway in the Underlying Action does not fall within the coverage provided by the 2023-2024 Policy.

133. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action, or any subsequent appeals of the verdict in the Underlying Action, under the 2023-2024 Policy.

134. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action under the 2023-2024 Policy, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**COUNT VI – DECLARATORY JUDGMENT**
**No Duty to Defend or Indemnify Under the 2022-2023 Policy**
**(Late Notice of Claim)**

135. Continental repeats and realleges the allegations set forth in paragraphs 1 through 126 as if fully set forth herein.

136. The Professional Services Coverage and the Products-Work Hazard Coverage of the Continental Policies applies to "**claims** only if: 1. Such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer in accordance with the **COMMON CONDITIONS**, the section entitled **DUTIES IF THERE IS A CLAIM**."

137. The Material Breach Notice is a "claim" as that term is defined in the Continental Policies and is the "claim" that is at issue in the Underlying Action.

138. The "claim" made in the Material Breach Notice is deemed to have been first made against Yourway upon receipt of the Material Breach Notice by Yourway's President Mr. Jaffer, which occurred between January 4, 2023 and January 16, 2023.

139. The DUTIES IF THERE IS A CLAIM section of the 2022-2023 Policy states that as a condition precedent to coverage under the policy, Yourway was required to notify Continental of the "claim" made in the Material Breach Notice "as soon as reasonably possible."

140. The DUTIES IF THERE IS A CLAIM section of the 2022-2023 Policy states that as a condition precedent to coverage under the policy, Yourway was required to promptly forward to Continental all documents that Yourway received in connection with a claim.

141. Yourway received the Material Breach Notice between January 4, 2023 and January 16, 2023.

142. Yourway did not notify Continental of the Material Breach Notice until at least October 3, 2023, which was after Vincerx filed its Complaint in the Underlying Action.

143. Yourway breached a condition precedent to coverage by failing to notify Continental of the "claim" as soon as reasonably possible."

144. Yourway breached a condition precedent to coverage by failing to promptly forward to Continental all documents Yourway received in connection with the claim made in the Material Breach Notice.

145. Yourway's breach of the conditions precedent to coverage prejudiced Continental in connection with the Underlying Action.

146. Therefore, the claim against Yourway in the Underlying Action is not covered under the 2022-2023 Policy.

147. Accordingly, Continental does not have a further duty to defend Yourway in the Underlying Action, or any subsequent appeals of the verdict in the Underlying Action, under the 2022-2023 Policy.

148. Furthermore, Continental does not have a duty to indemnify Yourway for any liability it incurs by settlement, judgment, verdict, or appeal in the Underlying Action under the 2022-2023 Policy, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

**WHEREFORE**, Plaintiff Continental Casualty Company requests judgment in its favor and against Defendant Yourway Transport, Inc., as follows:

(a) For a declaration that Continental Casualty Company has no duty to defend or to indemnify Yourway Transport, Inc. under the 2022-2023 Policy in connection with the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

(b) For a declaration that Continental Casualty Company has no duty to defend or to indemnify Yourway Transport, Inc. under the 2023-2024 Policy in connection with the Underlying Action, including but not limited to the $7,650,000 verdict entered against Yourway on March 5, 2026.

(c) For reimbursement of defense costs incurred in defending Yourway Transport, Inc. in the Underlying Action;

(d) For interest, attorneys' fees, and costs pursuant to law; and

(e) For such other and further relief as the Court deems equitable and just.

**KENNEDYS CMK LLP**

*/s/ Louis H. Kozloff*
Louis H. Kozloff
Thomas J. Seery
Kameron Mckithen
KENNEDYS CMK LLP
1600 Market Street
Suite 1410
Philadelphia, PA 19103
(267) 479-6700
Louis.Kozloff@kennedyslaw.com
Thomas.Seery@kennedyslaw.com
Kameron.Mckithen@kennedyslaw.com

Attorneys for Plaintiff
Continental Casualty Company

Date: May 5, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Amended Complaint for Declaratory Judgment was electronically filed with United States District Court for the Eastern District of Pennsylvania using the Court's ECF system, which will send notification of such filing to all counsel of record and is available for download.

**KENNEDYS CMK LLP**

*/s/ Louis H. Kozloff*
Louis H. Kozloff
KENNEDYS CMK LLP
1600 Market Street
Suite 1410
Philadelphia, PA 19103
(267) 479-6700
Louis.Kozloff@kennedyslaw.com

Attorneys for Plaintiff
Continental Casualty Company

Date: May 5, 2026